# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LAWRENCE J. PLAISANCE** | **CIVIL ACTION** |
| **VERSUS** | **NO: 08-5134-HGB-SS** |
| **MICHAEL ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION** | |

## REPORT AND RECOMMENDATION

The plaintiff, Lawrence J. Plaisance ("Plaisance"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claims for disability insurance benefits under Title II of the Act, 42 U.S.C. § 423. Rec. doc. 1.

## PROCEDURAL HISTORY

On April 23, 1990, Plaisance sustained a work-related injury to his back. R. 15. From August, 1994 through December, 1996, Plaisance was on a closed period of disability. R. 109. On October 6, 2003, he submitted an application for benefits, r. 40-42, alleging that his disability began on September 1, 1990. R. 20. He reported that he was unable to lift, bend, stoop, stand or sit for a long time, or walk far. R. 50. On November 7, 2003, the Commissioner denied his claim for benefits. R. 20-22. On August 2, 2005, there was a hearing before an ALJ. R. 103-120. On March 14, 2006, the ALJ issued an unfavorable decision. R. 9-18 and 140-49. The ALJ found that Plaisance was not under a disability as defined in the SSA through September 30, 1999, the date last insured. R. 18. On June 16, 2006, the Appeals Council denied his request for review of the ALJ's decision of March 14, 2006. R. 3-5.

Plaisance filed a complaint for review in this court. "Plaisance v. Social Security Administration," 06-4351-HGB-SS. On April 10, 2007, the undersigned recommended that Commissioner's cross-motion for summary judgment be granted and Plaisance's motion for summary judgment be denied. R. 152-171. On August 23, 2007, the District Judge remanded the matter to the SSA for consideration of additional evidence proffered by Plaisance. R. 173-74.

On August 6, 2008, there was a hearing before an ALJ. R. 419-482. On September 18, 2008, the ALJ issued an unfavorable decision. R. 129-137. On September 25, 2008, the Commissioner notified Plaisance of his deadline for filing a civil action. R. 126-28. On October 24, 2008, he requested review of the ALJ's September 18, 2008 decision. R. 121.

On December 15, 2008, Plaisance filed the complaint in this matter. Rec. doc. 1. The parties filed cross-motions for summary judgment. Rec. docs. 12 and 15.

Plaisance was represented by counsel throughout these proceedings.

## STATEMENT OF ISSUES ON APPEAL

Plaisance's filings raise the following issues:

1. Did the ALJ err in finding Plaisance capable of light work?

2. Did the ALJ err in failing to give controlling weight to Plaisance's treating physicians?

3. Did the ALJ err by failing to assess the side effects of Plaisance's pain and medication?

4. Did the ALJ use an incorrect standard to assess credibility?

## THE ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following findings relevant to the issues on appeal:

1. Plaisance met the insured status requirements of the Act through September 30, 1999.

2.      Plaisance has not engaged in substantial gainful activity since September 1, 1990, the alleged onset date (20 CFR § 404.1520(b) and 404.1571).

3.      Plaisance has the following severe combination of impairments: status post lumbar laminectomy and disc excision at L4-L5 with hardware removal and status post left knee partial medial and lateral meniscectomy (20 CFR § 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1, Regulations No. 4 (20 CFR § 404.1520(d), 404.1525 and 404.1526).

5.      Plaisance has the residual functional capacity to perform a reduced range of light work as defined in 20 CFR 404.1567(c) which allows for waist to shoulder lifting, horizontal lifting, and floor to waist lifting up to one third of the day consisting of objects weighing up to fifteen pounds, and the carrying of objects weighing up to five pounds with the right hand.

6.      Plaisance is unable to perform any past relevant work (20 CFR 404.1565).

7.      Plaisance was born in 1947 and was 42 years, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.      Plaisance has a marginal education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not an issue in this case because Plaisance past relevant work is unskilled (20 CFR 404.1568).

10.      Considering Plaisance's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform (20 CFR 404.1660(c) and 404.1566).

11.      Plaisance has not been under a disability, as defined in the Act, from September 1, 1990 through the date of this decision (20 CFR 404.1520(g)).

R. 134-37.

## <u>ANALYSIS</u>

a.      **<u>Standard of Review.</u>**

The function of this court on judicial review is limited to determining whether there is

substantial evidence in the record to support the final decision of the Commissioner as trier of fact

and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000); Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Newton, 209 F.3d at 452. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's. Id.; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Villa, 895 F.2d at 1022; Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 to 404.1599

& appendices, §§ 416.901 to 416.998 (1997). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity. Id. §§ 404.1520, 416.920; Newton v. Apfel, 209 F.3d at 453; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1] The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry. Id. If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989). When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant." Id.; accord Selders, 914 F.2d at 618.

The Court "weigh[s] four elements of proof when determining whether there is substantial

---

[1] The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled. Id. §§ 404.1520(c), 416.920(c)).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence. Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated. If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled. Id. §§ 404.1520(e) and (f), 416.920(e) and (f).

Fifth, if it is determined that the claimant cannot return to his or former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. Id. §§ 404.1520(g)(1), 416.920(g)(1). To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history." Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995). "The Commissioner, rather than the courts, must resolve conflicts in the evidence." Id.

b. **Testimony at the August 2, 2005 Hearing.**

Plaisance lived in Lafitte. R. 107. At the time of the hearing he was 58. R. 107. He had completed the ninth grade. R. 107. He described his ability to read and write as "somewhat." R. 107. He was supported by his wife. R. 108.

In the early 1990s, he worked for an apartment management company doing maintenance and painting work. R. 108. While working, he stepped on a roofing nail. R. 112. He jumped up and injured discs in his back. R. 112. Surgery was recommended. R. 112. The first surgery was not successful. R. 113. In the second surgery, plates and screws were installed. R. 113. In the third, the hardware was removed. R. 113. By that time there was significant scar tissue. R. 113. He did not get any relief from physical therapy. R. 111.

On a normal day he woke up around 8:00 a.m. He did not sleep well at night. R. 114. His wife and son helped him bathe and put on his shoes and socks. R. 115. He did not do much during the day. Sometimes he visited his wife at her work about seventeen miles away. R. 117. She worked as an apartment manager. R. 108-09. He drove a little, but it was very uncomfortable. R. 115. He had a driver's license. R. 115.

In 1999, he was not able to work because his back hurt. He could not lift, bend or stoop. He could not walk very far or stand for very long. R. 111. He could not sit for more than a half hour. R. 116. He could not stand in one position for more than fifteen minutes. R. 116. It was very

difficult for him to climb a flight of stairs. R. 116. He could not push up with his right leg. R. 116. He could lift about twenty pounds. R. 116. He would lie down a couple of times each day. R. 117. He could not walk more than a city block before he felt serious pain. R. 117. He could not do the simplest chores, like mop the floor. R. 117. He could not do his wife's job, because he could not sit as long as she did and he did not know how to operate a computer. R. 118. He wore a corset back brace. R. 111.

The vocational expert described his past relevant work as maintenance carpenter, which was classified as a skilled medium duty position. R. 119.

c. **Testimony at the August 6, 2008 Hearing.**

The ALJ and Plaisance's counsel agreed that the date last insured was September 30, 1999. R. 425. The ALJ confirmed with Plaisance's counsel that the new evidence to be considered on remand was in the record. R. 426-32.

Plaisance filed a claim for worker's compensation benefits with Louisiana in conjunction with his April 23, 1990 work-related injury. R. 432. During 1991, he returned to work for about three weeks. R. 14. He has not worked since. R. 433. In January 1991, he had a lumbar laminectomy. R. 433. In 1995, Dr. Cary removed the hardware. R. 433. In April 2001, he had knee surgery. R. 433.

Plaisance's counsel confirmed that certain statements made by the ALJ in his March 14, 2006 decision concerning Plaisance's medical treatment were not superseded or in need of correction. R. 434. The ALJ confirmed that a physical therapy record for June 25, 1991 reporting that Plaisance's back had gotten better and he would like to return to work was around the time when he went back to work for about three weeks. R. 435. Plaisance could not remember whether

he entered another physical therapy program. He recalled that he had difficulty with physical therapy because of the pain. R. 435-36. The ALJ referred to a February 25, 1991-letter from Dr. Klainer (R. 397) who reported Plaisance would return to work on February 25, 1991 on light duty. Plaisance responded that this was when he tried to do a desk job. R. 436.

A residual functional capacity evaluation completed in 1996 (R. 408-16) was the last one conducted prior to September 30, 1999. R. 437.

Prior to his work-related injury, Plaisance did repair work, painting with rollers and brushes and clean-up on the Shadow Lake Management apartment properties. R. 428. He did painting about two to three days a week. R. 438. The apartments were three stories high, so he was required to climb a ladder. R. 440. He worked for Shadow Lake Management for about five years before he was hurt. R. 440. Before that he was a licensed boat operator for crew boats. He lost his license when he failed to renew it. He was not able to pass the written test to regain it. R. 440-41. He also did shrimping. R. 442.

Plaisance could not remember whether he was required to do an eagle extension or a curl in physical therapy. R. 465-66. He recalled doing hip stretching exercises. R. 467.

The ALJ invited the vocation expert to examine the February 12-13, 1996 functional capacity evaluation. R. 442-43. Based on this evaluation, the testimony was that there would be jobs available in the light category but not a full range of light duty work. R. 443. The expert testified that, with the limitations described in the February, 1996 FCE, Plaisance could not have performed any of his past relevant work. R. 443-44. With these limitations, he could have performed work as a cashier or security guard. R. 444. His apartment maintenance work was medium duty, semi-skilled work. R. 444. His work as crew boat captain was light duty, skilled work. R. 444.

Plaisance's counsel urged that Plaisance was functionally illiterate. R. 446. Plaisance acknowledged that he could read a paint can to know its color. R. 447. If the hypothetical included a limitation of no repeated stretching of the back, the jobs as a cashier or security guard would fit within the hypothetical. R. 450. The expert agreed that the description of duties in Dr. Kliner's letter of February 25, 1991 was more applicable to sedentary work. R. 451. If the hypothetical included the limitations found in Plaisance's testimony, he would be limited to sedentary work. R. 452-53. The ALJ clarified that the last letter received from Dr. Kliner was dated August 31, 1992 (R. 381). R. 453.

Plaisance clarified that the first operation was a fusion, the second operation included installation of the plates and screws, and the third operation was for the removal of the hardware. R. 455.

Plaisance's son testified as a corroborative witness. R. 456. In 1995, he was thirteen and lived with his parents. R. 456-57. Prior to his father's injury in 1990, he recalled riding four wheelers with his father, playing catch and going on driving vacations. R. 457. After the injury, his mother had to go with him when he was in the Boy Scouts. R. 457. After the injury his father was in constant pain. R. 458. His father could not come to watch him participate in sports in high school. R. 459. His father gained weight. R. 460. It was necessary for him or his mother to put socks and shoes on his father's feet. R. 460. The son did yard work and other household chores. R. 460. The pain and medication caused his father to suffer mood swings. R. 461-63. His father required help getting up from a sofa. R. 462. On weekends when he was not in school, his father took naps. R. 462. He understood that his father was injured when he stepped on a nail, jumped back and hurt his back. R 464. He did not remember his father going to work after the injury. R.

465. His father drank very little alcohol. R. 465.

Plaisance's daughter testified as a corroborative witness. R. 467. She was 22 when her father was injured. At that time she was married and did not live at home. R. 468. After the injury, her father was in a lot of pain. He could not do the things he did before the injury. Before his injury the family took mini-vacations. After the injury, he could not sit in the vehicle. Her father could not attend his grandchild's athletic events. R. 469. There were times when he was not able to get to the restroom in time. R. 470. Since the injury, her father had gained a lot of weight. R. 470. He could not lift her fifteen pound dog. R. 470. Her father had to lay down during the day. R. 471. She spent four to six hours visiting with her father on week days and more on weekends. R. 471. The medication altered her father's personality. She did not want his grandchild to see him when he exhibited enraged behavior. R. 472. Since the last back surgery, she could not think of any full time work which her father could do. R. 472.

She believed that her father and brother each weighed 350 pounds. R. 473. She weighed 278 pounds. R. 474. She suffered from a thyroid disease. R. 474. Her brother suffered from an eating disorder. R. 474. Her father's medication included codeine and its derivatives which affected him tremendously. R. 475-76. At different time he took Percocet, Demerol, Vicodin, Loritab and Xanax. R. 475-76. From 1995 to 1999, he was not able to stand up for a long time in one place. R. 480. He could not walk a couple of blocks. R. 480.

**d**.    **Medical Records.**

On April 23, 1990, Plaisance was injured when he stepped on a nail. When he went home, he found that, while lying down, he was unable to change positions without experiencing severe back pain. R. 99. After his injury, he was seen for an infection in his foot. R. 380.

On April 27, 1990, he was seen by Dr. Philip Farris, an orthopedist. R. 380. A May 25, 1990 lumbar MRI revealed an abnormality at L4-5 with impingement at the L5 nerve root and mild degenerative changes at L2-3 and L3-4. R. 407. On May 29, 1990, Dr. Farris prescribed medication. R. 406. On June 19, 1990, he started Plaisance on physical therapy. R. 405. On July 20, 1990, Dr. Farris expressed concern about Plaisance's lack of progress. He continued him on medication and restricted him to light duty. R. 404. On October 1, 1990, Dr. Farris referred Plaisance to Dr. Frank Culicchia, an orthopedist, for an evaluation for surgery. R. 403. On November 5, 1990, Dr. Culicchia confirmed the recommendation for surgery. R. 402.

On December 28, 1990, Dr. Naum Klainer, an orthopedist in the same clinic as Dr. Farris, scheduled Plaisance for surgery on January 8, 1991. R. 389. On January 11, 1991, Dr. Klainer performed a lumbar laminectomy at L4-5 and a disc excision. The diagnosis was a herniated disc that compromised the right L5 nerve root. The report does not contain any reference to the installation of orthopedic hardware. R. 98.

Ten days after the surgery Plaisance was doing well. R. 388. Four weeks after the surgery his condition was described as satisfactory. R. 387. On February 25, 1991, Dr. Klainer allowed Plaisance to return to work on a trial basis and confined him to light duty. R. 397. On April 1, 1991, Dr. Klainer discharged Plaisance from active care. He was to return only as needed. At that time, Plaisance experienced intermittent back pain. He was left with a residual disability of ten percent of his whole body due to the disc rupture and disc excision. R. 386.

On April 10, 1991, Dr. Farris reported that Plaisance was restricted to light duty. Physical therapy was recommended. R. 385. On May 21, 1991, a physical therapist reported that Plaisance continued to complain of right leg pain, but Plaisance could perform his exercises. R. 376. On June

10, 1991, Plaisance reported leg pain. Dr. Farris gave him an injection. R. 396. Plaisance returned to Dr. Farris on June 12, 1991. He was fitted with a back brace. R. 395. On June 25, 1991, the physical therapist reported that Plaisance continued to complain of right leg pain. R. 375. On July 19, 1991, Plaisance reported pain in his back and paresthesias in his leg. R. 394. On July 24, 1991, he was seen by Dr. Klainer and Dr. Farris. An MRI was ordered, R. 393, and it revealed a protrusion above some scarring. On August 19, 1991, Dr. Farris recommended that Plaisance continue with his modified activities and wear a brace. R. 392. On August 30, 1991, Plaisance reported intermittent back pain. R. 391. On September 27, 1991, his condition was unchanged. R. 390. On January 14, 1992, Dr. Farris reported that Plaisance's condition was unchanged and he was referred to Dr. Klainer for possible surgery. R. 398.

On July 15, 1992, Dr. Farris reported that he believed that Plaisance should be re-evaluated by Dr. Klainer for possible surgery. R. 399 and 401. On August 31, 1992, Dr. Klainer reported that the straight leg test was positive for back pain but negative for leg pain. The most recent MRI did not reveal significant or severe impingement on the nerve roots. Dr. Klainer recommended that he return to light duty work. Plaisance was to return to Dr. Klainer about every three months. The only alternative was a lumbar laminectomy and disc fusion with instrumentation. R. 381-82.

Plaisance was admitted to West Jefferson Medical Center on January 7, 1993 and discharged on January 14, 1993. Dr. Klainer was his physician. R. 383 and 418. It appears that the lumbar laminectomy and disc fusion with instrumentation was performed at that time.

On February 15, 1995, Plaisance was seen by Dr. George Cary, an orthopedic surgeon, with complaints of low back pain. Plaisance reported to Dr. Cary that pedicle fixation plates were installed in 1992, which fused the area from L4 to S1. R. 73-74. Dr. Cary recommended removal

of the hardware to relieve the low back pain.  R. 74.

On March 15, 1995, Plaisance was seen by Dr. Cary in preparation for the surgery to remove the internal fixation device at L4 to S1.  R. 73.  On March 20, 1995, the plates were removed.  The surgery required two hours as the fixation device was overgrown with bone and a voluminous amount of scar tissue.  R. 72.

On February 12 and 13, 1996, a functional capacity evaluation was performed.  R. 408-16. Plaisance was found capable of maintaining work within the light physical demand level which was below the medium to heavy level required of his previous duties.  R. 409.

On February 3, 1998, Dr. Cary issued a certificate of mobility impairment.  R. 224.

On April 3, 2001, Dr. Farris performed a partial medial and lateral meniscectomy on Plaisance's left knee.  R. 87-90.

From October 2003 through July 2004, Plaisance was seen by Dr. Cary for complaints of pain in the lower back.[2]  He was given injections and medication was prescribed.  He was described as a candidate for disability evaluation.  R. 71.  His low back problem was described as chronic.  R. 85.  The pain radiated into both lower extremities.  R. 84.  X-rays revealed extensive arthritis in the lower lumbar spine.  R. 71.  On a March 18, 2004 visit, Dr. Cary reported that Plaisance had "some minor discomfort in the lower back," which on prolonged sitting became moderate discomfort and required him to move after about an hour of sitting.  On that visit Darvocet was prescribed.  R. 95. On June 17, 2004, it was noted that the use of shoe apparel helped him considerably in dealing with his back difficulty.  R. 94.  He had minor tenderness in the low back and left knee.  Any heavy

_____

[2]  The visits were on October 1 and 22 and November 19, 2003 and March 18, June 17 and July 15, 2004.  On these visits he was also seen for treatment of tennis elbow, which required injections and medication, and carpal tunnel syndrome.  R. 70-71, 84-85, 93-95.

lifting, excessive lifting or excessive activity caused a flare up.  R. 93.

On October 17, 2000, Plaisance was seen at the Nicholson Baehr Clinic by Dr. McSween for a cyst on the left shoulder and dry flaky skin.[3]  R. 243.  On February 9 and 14, 2001, he returned to Dr. McSween for pain in his left knee for ten days.  R. 241-42.  On February 27, 2003, he was seen by Dr. McSween for gout in the right foot.  R. 240.  On April 2, 2003, he returned to Dr. McSween for a follow-up visit.  R. 239.  On April 24, 2003, he was seen by Dr. McSween for a cyst on his back and pain in his left arm.  R. 238.  On September 10, 2003, he returned to Dr. McSween for an infection in his foot and elbow pain.  R. 237.  On September 16, 2003, he returned to Dr. McSween.  R. 236.  On February 20, 2004, he was seen by Dr. McSween for an infected cyst on his back.  R. 235.

On June 17, 2004, Dr. Cary described Plaisance as unable to sit for prolonged periods and unable to perform any heavy work activity.  He had a restricted range of motion.  Dr. Cary believed that Plaisance met the criteria for Social Security disability benefits.  R. 97.

On February 14, 2005, Plaisance was seen by Dr. McSween for complaint of neck and knee pain.  R. 234.  On March 29, 2005, he was seen by Dr. McSween for a follow-up after lab work.  R. 231-33.  On December 28, 2005, he complained of pain in both knees.  R. 230.  On September 18, 2007, Plaisance was seen by Dr. McSween for an infected cyst and pain in both knees.  R. 229.

On January 3, 2008, Plaisance was seen by Dr. McSween for a check-up.  R. 228.  On January 15, 2008, Plaisance was seen for pain in the groin.  R. 226-27.  On that date, he went to the emergency room at West Jefferson Medical Center.  He was admitted to the hospital for abdominal pain, diverticulitis, kidney stone, hypertension and gout.  R. 245-256.

---

[3]  Dr. McSween's speciality is not identified.

e.     **Plaintiff's Appeal.**

<u>Issue no. 1</u>.     Did the ALJ err in finding Plaisance capable of light work?

Plaisance argues that: (a) the ALJ found that he could perform a limited range of light work based on the February 12 and 13, 1996 functional capacity evaluation ("FCE") (R. 408-16); (b) the 1996 FCE did not allow him to do light or sedentary work; and (c) therefore the ALJ had no substantial evidence on which to make the determination of residual functional capacity. The Commissioner responds that even with the limitations described in the 1996 FCE, the physical therapist concluded that Plaisance could perform light work.

The ALJ found that Plaisance had the residual functional capacity to perform a reduced range of light work as defined in 20 CFR 404.1567(b). R. 135. Pursuant to this regulation,

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 CFR 404.1567(b). In describing the reduced range of light work, the ALJ found that Plaisance had a residual functional capacity which allowed for waist to shoulder lifting, horizontal lifting, floor to waist lifting up to one third of the day of objects weighing up to fifteen pounds, and carrying of objects weighing up to five pounds with the right hand. R. 135. The ALJ found that the February 1996 FCE and the May 21, 1991 FCE (R. 376) supported this assessment. R. 135. The ALJ gave significant weight to these reports. R. 136.

The ALJ and vocational expert reviewed the first category of limitations contained in the 1996 FCE regarding Plaisance's lifting, carrying and grip capacities. R. 442-43. The expert testified that this was not a full range of light work because light work would be up to twenty pounds

occasionally, ten pounds frequently.  R. 443.  The expert testified that with these limitations there were jobs available in the light category.  R. 443.  The expert identified the positions of cashier and security guard as examples of positions in the light duty category which could be performed with the lifting, carrying and grip capacities set out in the FCE.  R. 444.  The 1996 FCE found that Plaisance could not return to his maintenance job at the apartment buildings but he could return to work at a light level.  R. 409.  With the February 1996 FCE, the testimony of the vocational expert, and the other medical evidence described by the ALJ under part 5 of his decision (R. 135-36), there was substantial evidence to support the ALJ's finding that, during the relevant period, Plaisance could perform a reduced range of light work and there were a significant number of jobs in the national economy at that level of work.

Issue no. 2.    Did the ALJ err in failing to give controlling weight to Plaisance's treating physicians?

Plaisance contends that rather than giving significant weight to the opinions of his treating orthopedists, the ALJ gave significant weight to non-physician physical therapists, including the May 21, 1991 FCE which was prepared before Plaisance's third surgery.  Plaisance contends that this is contrary to the requirements of Newton v. Apfel, 209 F.3d 448 (5th Cir. 2000).  The Commissioner responds that the ALJ properly credited the opinions of the orthopedists.  The ALJ reported that he reviewed all the evidence.  R. 132.  He declined to give significant weight to Dr. Cary's June 17, 2004 report to Plaisance's counsel (R. 97).

Plaisance was seen by four orthopedists: Drs. Farris, Culicchia, Klainer and Cary.  He was seen by Dr. Farris from April 27, 1990 through October 22, 1990.  R. 380 and 402.  In October, 1990, Dr. Culicchia confirmed Dr. Farris' recommendation for surgery.  R. 402.  This is the only record of any contact with Dr. Culicchia.  On January 11, 1991, Dr. Klainer performed the first

surgery, a lumbar laminectomy at L4-5 and a disc excision. He discharged Plaisance from active care on April 1, 1991 (R. 386), but Plaisance returned to Dr. Farris on April 10, 1991. Plaisance continued to see both Dr. Klainer and Dr. Farris. The records indicate that in January 1993, Dr. Klainer performed a lumbar laminectomy and disc fusion with instrumentation. R. 383 and 418.

There are no further medical records from Dr. Klainer. Dr. Klainer died, as a result of which Plaisance went to Dr. Cary. R. 454. The first record of a visit to Dr. Cary is dated February 15, 1995. R. 73-74. On March 20, 1995, Dr. Cary surgically removed the hardware installed by Dr. Klainer. R. 72. The next medical record from Dr. Cary is the certificate of mobility impairment, dated February 3, 1998. R. 224.

On April 3, 2001, Dr. Farris performed a partial medial and lateral meniscectomy on Plaisance's left knee. R. 87-90.

On October 1, 2003, Plaisance returned to Dr. Cary. R. 71. On October 6, 2003, he filed his application for benefits. R. 40-42.

The last report from Dr. Klainer was dated August 31, 1992. Dr. Klainer reported that: (a) the straight leg raising test was positive for back pain but negative for leg pain; (b) a recent MRI coincided with a previous MRI (degenerative changes and posterior focal protrusion at L4-5 without any significant or any severe apparent impingement in the nerve root); (c) he did not recommend surgery; (d) he recommended that Plaisance return to light duty work on a trial basis with some limitations (avoid repeated bending and lifting and lifting any weighing more than 25-30 pounds); (e) if Plaisance experienced severe back or leg pain, he should return right away, otherwise in three months; and (f) if pain returned and became severe the alternative would be a lumbar laminectomy, disc fusion and possibly instrumentation. R. 381-82. Dr. Klainer did not state that Plaisance could

not perform light duty work. Dr. Klainer's August 31, 1992-report is consistent with the February 1996 FCE.

On April 10, 1991, Dr. Farris reported to the worker's compensation insurer that Plaisance could do light work. This too is consistent with the February 1996 FCE. There are no further reports by Dr. Farris on Plaisance's ability to return to work. Drs. Klainer and Farris were in the same office. The last report that either of them issued on Plaisance's ability to return to work was Dr. Klainer's report of August 31, 1992.

Dr. Cary removed the plates and screws on March 20, 1995. R. 73. There is no report by Dr. Cary regarding Plaisance's ability to return to work through the date last insured, September 30, 1999. The February 1996, FCE was performed at Dr. Cary's request. R. 408. There are no further reports by Dr. Cary until October 2003. R. 71.

Plaisance contends that Newton requires a remand because there was no examination by a consulting physician and there was no medical evidence to weigh against the evidence of his treating physicians. Drs. Klainer and Farris did not opine that Plaisance could not perform a reduced range of light duty work. To the contrary, the last report by either of them concluded that he could perform such work. On June 17, 2004, Dr. Cary reported that: (a) Plaisance had discomfort in the lower back radiating into both lower extremities; (b) he was unable to sit for prolonged periods or perform heavy work activity; (c) he had a restricted range of motion; and (d) he met the criteria for disability impairment and disability benefits. R. 97. Opinions that a claimant is disabled are reserved to the Commissioner. 20 C.F.R. § 404.1527(e). Dr. Cary's letter does not address Plaisance's condition as of September 30, 1999, the last date on which he was insured. Even if reports from Dr. Cary in 2003 and 2004 are construed as relating to Plaisance's condition in 1999,

it was not necessary for the ALJ to perform the detailed analysis required by 20 C.F.R. § 404.1527(d)(2) and Newton. There were reports from Dr. Klainer and Farris during the relevant period that Plaisance could perform a reduced range of light duty work.

Issue no. 3.     Did the ALJ err by failing to assess the side effects of Plaisance's pain and medication?

Plaisance contends that the ALJ failed to properly evaluate intensity, persistence, and limiting effects of his symptoms to determine the extent to which they affect his ability to do basic work. Pursuant to Social Security Ruling 96-7p, 1996 WL 374186 (S.S.A.), when the existence of a medically determinable physical impairment that could reasonably be expected to produce the symptoms has been established, "the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities." Id. at *1. This requires the ALJ to make a finding about the credibility of the individual's statements about the symptoms and their functional effects. Id.

The ALJ found that Plaisance's determinable impairments could reasonably be expected to produce the alleged symptoms. R. 136. The ALJ determined that Plaisance's statements concerning the intensity, persistence and limiting effects of the alleged symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment because: (a) significant weight was not assigned to Dr. Cary's June 17, 2004 report to Plaisance's counsel (R. 97); and (b) significant weight was assigned to the February 1996 and May 21, 1991 FCEs (R. 376 and 408-16). The ALJ made the finding on credibility required by SSR 96-7p.

The ALJ cited Plaisance's testimony that he must lie down throughout the day, but found that the objective medical evidence was devoid of any such limitation and referred to the FCE's as demonstrating a residual functional capacity for a reduced range of light work. R. 135. The medical

opinions from Dr. Klainer and Farris and FCEs during the relevant time are substantial evidence for the ALJ's finding that Plaisance's testimony of his limitations was at best partially credible (R. 135).

The ALJ applied the appropriate legal standard in evaluating Plaisance's description of the side effects of his condition and treatment, and there is substantial evidence to support the ALJ's finding on Plaisance's credibility.

<u>Issue no. 4.</u>    Did the ALJ use an incorrect standard to assess credibility?

Social Security Ruling 96-7p provides that:

> In making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements. Based on a consideration of all of the evidence in the case record, the adjudicator may find all, only some, or none of an individual's allegations to be credible. The adjudicator may . . . find credible an individual's statement that the abilities to lift and carry are affected by symptoms, but find only partially credible the individual's statements as to the extent of the functional limitations or restrictions due to symptoms. . . .

1996 WL 374186, *4. The ALJ did not accept the testimony of Plaisance's son and daughter "to be of probative value in the establishment of any disabling physical impairment for claimant as the same is too general and does not corroborate with the existing medical evidence of record." R. 135. The ALJ stated at the hearing that he had no doubt in his mind that Plaisance's daughter came to the hearing to "testify that in your mind you believe that everything you've told me is absolutely true." R. 473. The ALJ found that Plaisance's testimony was "at best partially credible given the large gaps of time in which claimant did not seek ongoing medical care for his allegedly debilitating physical impairments." R. 135.

Plaisance contends that: (a) the ALJ failed to consider the factors identified by SSR 96-7p in assessing his credibility, for example his daily activities; (b) the ALJ's statement to Plaisance's

daughter cannot be reconciled with the finding that her testimony is not probative; (c) the ALJ failed to ask Plaisance's son about his father's daily activities; and (d) the ALJ referred several times to the fact it was likely that the case would return to the District Court. The Commissioner responds that: (a) the ALJ discussed the testimony of the son and daughter; (b) their testimony may be rejected as subject to influence by Plaisance (<u>Harrell v. Brown</u>, 862 F.2d 471, 482 (5th Cir. 1988)); and (c) whether pain is disabling is within the discretion of the ALJ and his finding is entitled to considerable deference (<u>Wren v. Sullivan</u>, 925 F.2d 123, 128 (5th Cir. 1991)).

The ALJ considered Plaisance's report of his limitations and daily activities, including the need to lie down during the day. R. 17. The ALJ did not fully credit the testimony of Plaisance and his two children because it was not corroborated by the medical evidence of record and the presence of large gaps of time in which Plaisance did not seek medical care. The court may not re-weigh the evidence or substitute its judgment for the Commissioner's. <u>Carey v. Apfel</u>, 230 F.3d 131, 135 (5th Cir. 2000).

## **RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that: (1) the Commissioner's cross-motion for summary judgment (Rec. doc. 15) be granted; and (2) Plaisance's motion for summary judgment (Rec. doc. 12) be denied.

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal

the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 17th day of August, 2009.

**SALLY SHUSHAN**
**United States Magistrate Judge**